IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JESSIE M. EDRALIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 14 C 09935 |
| v. ) | |
| ) | Judge John J. Tharp, Jr. |
| ADVENTIST GLENOAKS HOSPITAL, ) | |
| an Illinois Corporation, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jesse Edralin sued his former employer Adventist GlenOaks Hospital ("Hospital") after he was terminated from his job there as a Materials Service Representative/Tech on May 23, 2013. In his amended complaint, Edralin alleges that another employee sexually harassed him, and then lodged a false sexual harassment complaint against him with a supervisor and human resources employee at the Hospital. Edralin alleges that he then made his own complaint about the sexual harassment he says he experienced, and that the Hospital terminated him two days later. The Hospital moved for summary judgment. For the reasons set forth below, the Hospital's motion for summary judgment is granted as to the sexual harassment claim in Count I and denied as to the retaliation claim in Count II.

### BACKROUND

Edralin worked as a Materials Service Representative/Tech in the Hospital's materials management department in Glendale Heights, Illinois, from about May 2003 until his termination on May 23, 2013. Def. Statement of Undisputed Material Facts (*hereinafter* Def. SOF) ¶ 1, 3; Pl. Resp. to Def. SOF (*hereinafter* Pl. Resp. SOF) ¶ 1, 3. In that role, Edralin's job duties included visiting the Hospital's various units to inventory and restock hospital supplies,

which are stored on shelves inside the materials management department for that purpose. Def. SOF ¶ 13; Pl. Resp. SOF ¶ 13. In or around May 2013, Naseem Jahangir was a lead materials service representative, a role generally held by the person who has the most knowledge about products in the department. Def. SOF ¶ 15; Pl. Resp. SOF ¶ 15. The lead materials service representative communicates with outside members of the Hospital's staff and is the go-to person for other employees in the department who have questions about stock. Def. SOF ¶ 15; Pl. Resp. SOF ¶ 15. At this same time, Kevin Willis was the manager of the materials management department and the direct supervisor of Jahangir and Edralin. Def. SOF ¶ 12, 16; Pl. Resp. SOF ¶ 12, 16. Sylvia Seals-Brown was the Director of Human Resources/HR Business Partner at the Hospital, and in that role oversaw employee benefits and termination, among other job duties. Def. SOF ¶ 19; Pl. Resp. SOF ¶ 19.

On Monday, May 20, 2013, Jahangir came to visit Seals-Brown at the Hospital and made a complaint that Edralin had sexually harassed her. Def. SOF ¶ 20; Pl. Resp. SOF ¶ 20. Bryan Sitkawitz, who was a materials service representative at the Hospital, accompanied her to the human resources office when she made this complaint. Def. SOF ¶ 14, 20; Pl. Resp. SOF ¶ 14, 20. The Hospital asserts that Jahangir told Seals-Brown that Edralin had been making her uncomfortable and touching her inappropriately, that he had been hugging her, rubbing her leg, and touching her hair, and that Sikawitz had witnessed some of this. Def. SOF ¶ 21.[1] Seals-Brown and Willis interviewed Jahangir together about her sexual harassment complaint later that same day. Def. SOF ¶ 22. The Hospital asserts that in that interview, Jahangir repeated her

---

[1] Edralin indicates that he does not possess the requisite knowledge to confirm or deny what was said at this or other meetings at which he was not present. *See, e.g.*, Pl. Resp. SOF ¶ 21-26. To the extent he admits what Jahangir said at her interview with Seals-Brown and Willis, Edralin asserts that he "does not understand his admission to pertain to the accuracy of the statements" she made. *See, e.g., id.* at ¶ 21, 24-25.

allegation that Edralin had touched her inappropriately—saying that he would stroke her hair, hug her from behind, stroke her arm, and rubbed his hand against her thigh—and said that she did not feel comfortable working with him, was afraid of him, and wanted his conduct to stop. Def. SOF ¶ 24. Jahangir also said, according to the Hospital, that she had told Edralin, "Get your fucking hands off of me," and that Edralin had called her personal phone and left messages saying, "I miss you and I love you." Def. SOF ¶¶ 24-25. Seals-Brown testified in her deposition that she asked Jahangir if she had any messages to show her, and that Jahangir said she did not. Pl. Resp. SOF ¶ 25; Seals-Brown Dep. at 33:7-8, ECF No. 32-1, Ex. F. After Jahangir's interview, she was allowed to go home for the rest of the day with pay. Def. SOF ¶ 26.

Later that day, Seals-Brown and Willis met with Edralin in Seals-Brown's office and told him that Jahangir had lodged a sexual harassment complaint against him asserting that he made her feel uncomfortable and that he had touched her hair and her arms and had hugged her from behind. Def. SOF ¶ 27; Pl. Resp. SOF ¶¶ 27-28. Edralin initially denied Jahangir's allegations, but later in the May 20 interview said that he had hugged Jahangir during the holidays, had touched her hair to say that she had split ends, and may have touched her arm when she said she had a rash. Def. SOF ¶¶ 30-31; Pl. Resp. SOF ¶ 30. Edralin told them that none of those instances of physical conduct were inappropriate in nature. Def. Reply to Pl. Statement of Additional Facts ¶ 11, ECF No. 43. After that interview, the Hospital suspended Edralin with pay pending the investigation. Def. SOF ¶ 32; Pl. Resp. SOF ¶ 32.

On either May 20, or 21, 2013, Seals-Brown met with Sitkawitz, who told her that he had witnessed Edralin rub Jahangir's back, touch her hair, and hug her on occasion, and that Jahangir would eventually say no and then Edralin would huff and walk away. Def. SOF ¶¶ 33-34. Edralin denies the accuracy of Sitkawitz's alleged statements. Pl. Resp. SOF ¶ 34. On or about

May 20 or 21, Seals-Brown also met with DeAndre Moore, a transporter at the Hospital who said that Jahangir had told him that Edralin had been touching her inappropriately. Def. SOF ¶¶ 36-37. According to the Hospital, both Sitkawitz and Moore said that Jahangir had asked them if they thought she should tell Edralin's wife, who worked at the Hospital, and that Sitkawitz and Moore both told her that she should tell the Hospital's human resources staff. Def. SOF ¶¶ 35, 37.

Edralin called the Hospital on May 21, 2013, leaving voicemails for Seals-Brown and Willis and asking each of them to call him back. Def. SOF ¶ 38; Pl. Resp. SOF ¶ 38. Seals-Brown and Willis called him back that same day, and Edralin said on that call that Jahangir had come to the Hospital on her day off on Saturday, May 18, 2013. Def. SOF ¶ 39; Pl. Resp. SOF ¶ 39. Edralin also reiterated that he had not touched Jahangir in any unwanted or inappropriate way, and that he believed Jahangir's actions in coming to work to talk to him on her day off suggested she was not afraid of him. Pl. Additional SOF ¶ 12, ECF No. 41; Def. Reply to Pl. Statement of Additional Facts ¶ 12. Edralin testified at his deposition that he also told Willis and Seals-Brown that they should check the security camera for his department. Edralin Dep. 27:12-13. Seals-Brown asked Edralin to come in to meet with her and Willis later that day. Def. SOF ¶ 39; Pl. Resp. SOF ¶ 39.

That afternoon, Edralin met with Seals-Brown and Willis. Def. SOF ¶ 47; Pl. Resp. SOF ¶ 47.[2] Seals-Brown and Willis recall Edralin telling them at that meeting that three days earlier, on May 18, Jahangir came to work and asked him to come into the closet with her and to bring a

---

[2] The Hospital notes in its Statement of Facts that at Edralin's deposition, he testified at one point that he had met with Willis and Seals-Brown only on May 20, 2013, and that at that meeting that he told them that Jahangir had come to the Hospital on her day off and that they should look at the security camera. Def. SOF ¶ 49; Edralin Dep. 26:6—28:1, 30:12-15. The parties agree in their filings, however, that Edralin met with Seals-Brown and Willis on May 21. *See* Def. SOF ¶ 47; Pl. Resp. SOF ¶ 47; Seals-Brown Dep. at 50:11-18; Willis Dep. 55:13-24.

4

stool, and that they then went into the closet where he sat on the stool, Jahangir straddled him or sat on his lap, and she lifted her shirt or dress. Def. SOF ¶ 48; Seals-Brown Dep. 51:10–52:1-5; Willis Dep. 57:18–59:1. Seals-Brown and Willis also testified that Edralin told them that he had said no to Jahangir, and according to Seals-Brown, Edralin said that he did not touch her. Def. SOF ¶ 48; Seals-Brown Dep. 52:8-14; Willis Dep. 59:5. At his deposition in this case, Edralin testified that Jahangir had asked him to sit on the stool, that she started to disrobe and said "let's have sex," and that he said no and did not have any physical contact with Jahangir. Def. SOF ¶ 50; Pl. Resp. SOF ¶ 50.

Willis obtained a copy of the ID badge swipe log from the Hospital's security which showed that Jahangir had swiped into the materials management department on May 18, 2013, and also obtained a copy of a surveillance video which further confirmed her entrance on that date. Def. SOF ¶ 40-41; Pl. Resp. SOF ¶ 40-41. On May 21, 2013, Seals-Brown and Willis watched the video from May 18, which showed Jahangir walking into the materials management department and also depicted Edralin carrying a stool and walking to a small closet that is the back of a sterile processing machine. Def. SOF ¶ 43; Pl. Resp. SOF ¶ 43. The video showed Edralin entering the closet, and Jahangir entering the closet after him. Def. SOF ¶ 43; Pl. Resp. SOF ¶ 43. Edralin testified at his deposition that Jahangir then closed the door. Pl. Resp. SOF ¶ 43; Edralin Dep. at 60:12-13, ECF No. 32-1, Ex. C. The video showed Edralin and Jahangir leaving the closet about eight or nine minutes later. Def. SOF ¶ 43.

While Edralin and Jahangir were in the closet, he did not at any point walk toward the closet door or attempt to leave. Def. SOF ¶ 44; Pl. Resp. SOF ¶ 44. Edralin asserts that this was because he did not want to leave by force and risk hurting Jahangir. Pl. Resp. SOF ¶ 44; Willis Dep. at 60:21-61:4, ECF No. 32-1, Ex. D. The closet contains the back of sterile processing

machines that are used to sterilize surgical equipment, and the parties dispute whether Edralin would have a reason to enter the closet related to his job duties. Def. SOF ¶¶ 45-46; Pl. Resp. SOF ¶ 45-46. Edralin asserts that he went into the closet thinking that Jahangir either needed help reaching something on a closet shelf, or wanted to discuss a disagreement they had a few days earlier. Pl. Resp. SOF ¶ 42; Edralin Dep. at 48:3-23. It is undisputed that Edralin and Jahangir did get into a minor, work-related disagreement on May 15, 2013. Def. Reply to Pl. Statement of Additional Facts ¶ 4, ECF No. 43.

After hearing from Edralin and viewing the video, Seals-Brown and Willis also met again with Jahangir on May 21, 2013. Def. SOF ¶¶ 51-52; Willis Dep. 35:21—36:3, 46:23—49:4. Jahangir initially denied that she had even come into work on May 18, and further denied that she had gone into the closet with Edralin. Def. SOF ¶¶ 51-52. When Seals-Brown and Willis informed Jahangir that they had badge and video surveillance information which showed she had, in fact, come to the Hospital on May 18, Jahangir admitted to doing so and to going into the closet with Edralin. *Id.* ¶ 53; Pl. Resp. SOF ¶ 53. The parties agree that Jahangir also said something to the effect that she intended to let Edralin "have his way with" her, Def. SOF ¶ 53; Pl. Resp. SOF ¶ 53, and Seals-Brown specifically testified that Jahangir said, "I just thought if I let him have his way with me it would be over." Def. SOF ¶ 53; Seals-Brown Dep. at 67:20-22. After that meeting, Seals-Brown and Willis sent Jahangir home pending completion of the investigation. Def. SOF ¶ 54; Pl. Resp. SOF ¶ 54.

The Hospital terminated both Edralin and Jahangir on May 23, 2013, at separate meetings. Def. SOF ¶ 62, 65; Pl. Resp. SOF ¶ 62, 65. Seals-Brown and Willis's proffered reasons for their decision to terminate Edralin were that he lied during the investigation by denying that he had touched Jahangir in an inappropriate way, and by first denying, then later

admitting, that he had touched her at all; and that he violated the Hospital's conduct policy by admitting to the inappropriate touching of a female co-worker, conducting personal business during work time, and having inappropriate interactions with a co-worker at work by going into the closet with Jahangir for no work-related reason. Def. SOF ¶ 55. Edralin disputes the accuracy of those reasons, and denies the Hospital's assertion that those are the reasons he was terminated. Pl. Resp. SOF ¶ 55. Seals-Brown and Willis both stated in their declarations in this case that at the time they made this decision, they honestly believed in the truth of those reasons. Def. SOF ¶¶ 56-57; Pl. Resp. SOF ¶¶ 56-57. The proffered reasons behind their decision to terminate Jahangir were that she lied during the investigation, violated Hospital policy by coming to work when not permitted and interfering with another employee's work, and had inappropriate interactions with a co-worker. Def. SOF ¶ 64; Pl. Resp. SOF ¶ 64.

By way of additional background, the Hospital does maintain an employee handbook, and Edralin has acknowledged that he received a copy of that handbook in 2008. Def. SOF ¶¶ 4-5; Pl. Resp. SOF ¶¶ 4-5. The handbook's policy on "Attitude and Conduct" states that "[b]ehaviors involving harassment, offensive speech or inappropriate conduct are prohibited," and its "Employee Opportunity" policy states that "[t]his facility also prohibits any form of workplace harassment, intimidation or retaliation." Def. SOF ¶¶ 7-8; Pl. Resp. SOF ¶¶ 7-8. Additional policies in the handbook indicate that dishonesty, failure to comply with the Hospital's written policies, and harassment on account of sex all constitute violations of the Hospital's rules of conduct; that employees "are prohibited from engaging in unwelcome sexual advances, requests for sexual favors or other verbal, visual or physical conduct" based on sex; and that violation of the facility's policies will result in disciplinary action "up to and including termination." Def. SOF ¶¶ 9-11; Pl. Resp. SOF ¶¶ 9-11. The handbook states that employees

who believe they have been harassed "should immediately report the alleged incident" to their supervisor, department director, or the Human Resources director, and that employees "are encouraged to report incidents of harassment within 72 hours" to allow for prompt investigation. Def. SOF ¶ 11; Pl. Resp. SOF ¶ 11; Ex. 2 to Edralin Dep. at DEF 00236, ECF No. 32-1.

Edralin launched this lawsuit in Illinois state court on November 3, 2014, and the Hospital removed the case to this Court the following month. *See* Notice of Removal, ECF No. 1. In the amended complaint Edralin filed on May 29, 2015, he accused the Hospital of harassing him because of his sex (Count I) and of discharging him in retaliation for his opposition to discrimination (Count II), both in violation of the Illinois Human Rights Act, 775 ILL. COMP. STAT. 5/1-101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq*. Am. Compl., ECF No. 21. Edralin asserted that he had filed charges of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission, and that the Illinois agency had notified him on August 8, 2014, of his right to file a civil action in state court within 90 days. *Id.* at 1. The federal agency issued him a right-to-sue letter on May 11, 2015, in which it indicated that it had adopted the state agency's findings, Edralin asserted in his amended complaint. *Id.* The Hospital moved for summary judgment on September 28, 2015. Mot. for Summ. J., ECF No. 30.

## ANALYSIS

The Hospital seeks summary judgment on both of the claims that Edralin raises in his amended complaint. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014). When considering a motion for summary judgment, the Court construes the facts and makes all reasonable inferences in favor of the non-moving party. *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence . . . or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (internal quotation marks and citation omitted). Rather, the Court's role is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

Edralin states in his response brief that he "has decided to voluntarily dismiss" the sexual harassment claim he brought against the Hospital in Count I. Pl. Resp. at 2 n.1, ECF No. 36. The Hospital argues in its reply that Edralin has abandoned that claim, and that this Court should grant summary judgment to the Hospital on Count I. Def. Reply at 1 n.1, ECF No. 42. At this stage of the litigation, Edralin cannot avoid judgment on that claim by unilaterally dismissing it, and in any event has not filed a motion pursuant to Federal Rule of Civil Procedure 41 to do so. *See* Fed. R. Civ. P. 41(a)(1). As Edralin has abandoned his sexual harassment claim, summary judgment in favor of the Hospital on that claim is appropriate.

Edralin's retaliation claim is the sole remaining claim. Employers are barred from punishing employees for complaining about Title VII violations. 42 U.S.C. § 2000e–3(a). Retaliation is also "a cognizable claim under . . . the IHRA." *Bagwe v. Sedgwick Claims Mgmt. Servs.*, Inc., 811 F.3d 866, 887 (7th Cir. 2016) (citing 775 Ill. Comp. Stat. 5/6–101), *cert. denied*, 137 S. Ct. 82 (2016). When considering IHRA claims, Illinois courts "apply the federal Title VII framework." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016); *see also Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989). The

9

Seventh Circuit has said that Title VII retaliation claims may be proved directly or indirectly, *see e.g. Nichols v. S. Ill. Univ.–Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007), but the Court of Appeals recently clarified that district courts must not "separat[e] 'direct' from 'indirect' evidence and proceed[] as if they were subject to different legal standards." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Courts "must consider evidence as a whole, rather than by asking whether any particular piece of evidence proves the case by itself." *Williams v. Office of Chief Judge of Cook Cnty.*, 839 F.3d 617, 626 (7th Cir. 2016). The inquiry, then, is simply whether the record contains "sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1115 (2017). In analyzing that issue, the Court of Appeals has repeated its articulation that success on a Title VII retaliation claim requires plaintiffs to "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling*, 840 F.3d at 383 (quoting *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)).[3]

---

[3] In *Ortiz*, the Seventh Circuit also specifically stated that its decision in that case did not concern the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), even though that framework has at times been characterized as an "indirect" method of proving employment discrimination. *Ortiz*, 834 F.3d at 766. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case that "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016) (quoting *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)), *cert. denied*, 137 S. Ct. 398 (2016). If a plaintiff makes that showing, the burden then shifts to the employer to state "a legitimate, nondiscriminatory reason for the employment action," and if the employer does so, then the burden shifts back to the plaintiff, "who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 809-10 (7th Cir. 2014) (citing *McDonnell Douglas*, 411 U.S. at 802, 804). Here, Edralin has not presented any evidence regarding similarly situated employees—beyond, arguably, Jahangir, who was also terminated and so did not receive more favorable treatment—

The Hospital argues that Edralin has failed to show, based on his own testimony, that he engaged in any protected activity before the Hospital terminated him. Def. Mem. at 12 n.3. Specifically, the Hospital asserts that according to Edralin's deposition testimony, the only statement regarding the May 18, 2013 incident that Edralin made to Seals-Brown and Willis was that Jahangir had come to the Hospital that day and that they should check the video footage which, the Hospital argues, simply shows two people entering a closet. *Id.* The Hospital dismissively adds that Seals-Brown and Willis also "recall Plaintiff providing some additional information regarding the closet incident." *Id.* (citing Def. SOF ¶ 48). That "additional information," recounted in the Hospital's own statement of facts and supported by Seals-Brown's and Willis's depositions, is quite germane. The Hospital's statement of facts notes that at the meeting on May 21, 2013 with Seals-Brown and Willis, Edralin informed them that after going into the closet, "he sat on the stool, that Ms. Jahangir straddled him or sat on his lap and lifted her shirt," and that Edralin also stated that "he said no and that he did not touch Ms. Jahangir." Def. SOF ¶ 48. These statements preceded Edralin's termination on May 23, 2013. Seals-Brown and Willis also state in their declarations, however, that Edralin never indicated to them that he wanted to lodge a sexual harassment complaint against Jahangir, and never asked Seals-Brown or Willis to take any action regarding Jahangir. Willis Decl. ¶ 7, ECF No. 32-1, Ex. E; Seals-Brown Decl. ¶ 3, ECF No. 32-1, Ex. H.

The Hospital thus raises the issue of what words, exactly, will suffice to qualify as a protected action in which an employee "opposed any practice made an unlawful employment practice by" Title VII. *See* 42 U.S.C. § 2000e–3(a). A statutorily protected activity must go beyond a simple "complaint about some situation at work, no matter how valid the complaint

---

and has not otherwise argued that he satisfies the requirements of the *McDonnell Douglas* framework.

11

might be." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016), *cert. denied*, — S. Ct. —, No. 16-1032, 2017 WL 1366744 (Apr. 17, 2017). Rather, to be protected under Title VII, that complaint needed to have indicated "the discrimination occurred because of sex, race, national origin, or some other protected class . . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* (quoting *Orton–Bell v. Indiana*, 759 F.3d 768, 776 (7th Cir. 2014)). When considering the Hospital's summary judgment motion, this Court must construe the facts in the light most favorable to Edralin. Though the Hospital argues that Seals-Brown and Willis understood Edralin's statements as an attempt to respond to or defend against Jahangir's sexual harassment complaint, a reasonable person could conclude that Edralin, by relaying what he says occurred in the closet, was also complaining about Jahangir's alleged sexual harassment against him. The evidence of statements Edralin made to Seals-Brown and Willis at the May 21, 2013 in-person meeting serves to satisfy the first prima facie element of Edralin's retaliation claim at this stage of the litigation. As to the second prima facie element, the Hospital does not attempt to argue that Edralin did not suffer an adverse employment action.

It is the third prima facie element of Edralin's retaliation claim—the existence of a causal link—that the Hospital most strongly challenges. The Hospital argues that the only evidence that Edralin's termination was retaliatory is the timing of that adverse employment action, and that while he was terminated within a few days of informing Willis and Seals-Brown about the closet incident, that timing is not suspicious. Def. Mem. at 13. The timing, instead, resulted from Jahangir's complaint against Edraline on May 20, 2013 and the conclusion of the sexual harassment investigation that found Edraline had violated the Hospital's policies, the Hospital asserts. *Id.* Those violations, the Hospital argues, were that (1) Edralin had lied during that

investigation by first denying, then admitting, that he had touched Jahangir, and by denying that he had touched her inappropriately; and that (2) Edralin had violated the Hospital's conduct policy by inappropriately touching a female co-worker, conducting personal business during work hours, and having inappropriate interactions with a co-worker at work by going into the closet with Jahangir for no work-related reason. *Id.* at 12. The Hospital also represents that it is "undisputed" that Edralin's report of the closet incident to Willis and Seals-Brown "was not a factor in their decision to terminate Plaintiff's employment," *see id.* at 13 (citing Willis's and Seals-Brown's depositions), though Edralin in fact does dispute that assertion, as evidenced in his response brief and by his pursuit of the retaliation claim itself. *See* Pl. Resp. SOF at ¶ 66.

Edralin argues in his response brief that the "suspicious timing" in this case is sufficient to show a causal link between his complaint about sexual harassment and his termination two days later. Pl. Resp. at 8. Edralin asserts that the timing, once combined with the Hospital's "attempt to cover-up its retaliatory motive by relying on baseless facts deduced from a substandard two-day investigation," allows the Court to infer that the Hospital's explanation for Edralin's termination is pretextual. *Id.* at 9. The Hospital's explanation that Edralin lied during the investigation actually refers to a situation that could be construed as a mere misunderstanding, Edralin asserts, as Edralin first denied that he ever touched Jahangir but then immediately modified his answer when he realized Seals-Brown was asking him about any touching, not just touching of a sexual nature. *Id.* at 12. Edralin contrasts his alleged lying with that of Jahangir, which the Hospital identified as a reason for her termination and which involved her lying about whether she went into work on a day she was not scheduled, when she had last spoken with Edralin, and whether she entered the closet. *Id.* at 12-13. Those statements "are incapable of any alternative interpretation that would absolve Ms. Jahangir from blame," unlike

Edralin's alleged lies, he argues.

Edralin takes issue with the Hospital's other proffered reasons for his termination as well. The evidence indicates that the Hospital's conduct policy forbids engaging in "unwelcome" sexual advances, and Edralin asserts that his admitted instances of physical contact with Jahangir were not sexual in nature and that she never put him on notice that they were unwanted. *Id.* at 13. Edralin also argues that he did not violate the policy by conducting personal business during work time because when he entered the closet with Jahangir, he did so under the impression that the she wanted to discuss a work-related disagreement or needed his help getting equipment off a shelf. *Id.* at 14. Edralin argues that because the Hospital's proffered reasons for his termination are unsubstantiated and because the Hospital could not convincingly liken those reasons to the reasons behind Jahangir's termination, the proffered reasons either resulted from "reckless investigation" or do not reflect the Hospital's actual motivation in firing him. *Id.* at 14-15.

Suspicious timing, which Edralin points to here to support his argument that a causal link exists, will only rarely be enough on its own to support an inference of retaliation. *High Voltage*, 839 F.3d at 564. Timing is undoubtedly relevant, however, and it is not true that suspicious timing may never be sufficient on its own to allow a retaliation claim to proceed. Such timing may be sufficient when "an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Id.* (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)). The Court draws that inference based on the record here. Edralin made his complaint to Seals-Brown and Willis, and two days later, those Hospital employees effectuated their decision to terminate him. The Seventh Circuit has recently drawn an inference of retaliation in the context of a two-day period between complaint and retaliation. *See id.* ("Bohlen and Kopecky

fired Lord two days after he talked to Bohlen about Reimer. Kopecky was aware of Lord's complaint because Bohlen immediately forwarded it to him.").

Still, when "confronted with circumstantial evidence of a retaliatory motive, the employer may show that the employee would have been fired even absent his complaints about harassment." *Id.*; *see also Culver*, 416 F.3d at 546. If the Hospital can do so, then its allegedly retaliatory motive was not the but-for cause of Edralin's harm. *Id.*; *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) (finding that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action"). Even then, however, Edralin's claim can survive summary judgment "if a material factual dispute exists on the question of pretext." *High Voltage*, 839 F.3d at 564. Pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Id.* (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)) (internal quotation marks omitted).

This Court finds that there is a material factual dispute regarding pretext that precludes summary judgment on Edralin's retaliation claim. To be sure, many of Edralin's arguments regarding the Hospital's proffered reasons for his termination are misplaced. His attempts to distinguish between his own conduct and Jahangir's conduct are largely unilluminating, as Jahangir was also terminated in the wake of the harassment complaints and the Hospital's investigation. Edralin's allegations that the Hospital's investigation was insufficient and that the reasons for his termination were not well-founded also miss the point. The Seventh Circuit has repeatedly stated that a court's role is not to "second-guess[] an employer's facially legitimate business decisions," and that an employer's explanation for a termination may be trivial or even baseless as long as the employer "honestly believed the proffered reasons" for that adverse

15

employment action. *Culver*, 416 F.3d at 547 (internal quotation marks omitted). In this case, it is true that Seals-Brown and Willis both state, via deposition or declaration, that they believed the truth and accuracy of their reasons for Edralin's termination. Still, it is the complexity presented by the two dueling harassment complaints—first from Jahangir, and then from Edralin—about separate instances of alleged conduct, together with the compressed timeline on which the relevant events occurred, that makes a definitive finding regarding pretext too close to call as a matter of law at this stage of the case. The Court notes that the Hospital did not terminate Edralin until after he had made his sexual harassment complaint at the May 21 in-person meeting with Seals-Brown and Willis. Yet before Edralin made his complaint, Jahangir had already lodged her own complaint against Edralin, and Seals-Brown and Willis had already conducted the interview in which they say Edralin first denied, and then admitted, to having touched Jahangir in the past. The Hospital therefore knew about the basis for at least one of its proffered reasons for Edralin's termination—that he lied during the investigation—before Edralin lodged his own harassment complaint, but did not terminate him until after he had engaged in that protected activity. This Court cannot conclude that there is no dispute of material fact as to Edralin's retaliation claim, and denies the Hospital's motion for summary judgment on that claim.

\*   \*   \*

For the foregoing reasons, the Hospital's motion for summary judgment is granted as to Edralin's sexual harassment claim and denied as to Edralin's retaliation claim.

Date: April 26, 2017

John J. Tharp, Jr.
United States District Judge